IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

DARRIEN WILLIAMS, RICHARD
BRANDON, and DAVID MARTIN                                               PLAINTIFFS

VS.                              Case No. 04-CV-4109

OSMOSE UTILITIES SERVICES,
INC.                                                                    DEFENDANT

## MEMORANDUM OPINION

Plaintiffs Darrien Williams, Richard Brandon, and David Martin filed this civil action against Defendant Osmose Utilities Services, Inc. ("Osmose") alleging claims for discrimination, hostile work environment, and retaliation in violation of 42 U.S.C. § 1981. The claims arise out of Plaintiffs' employment relationships with Osmose. The Court held a bench trial on February 27 and 28, 2006. The Court finds the matter ripe for decision and now enters its findings of facts and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

I.      **Findings of Facts**

Plaintiffs Darrien Williams, Richard Brandon, and David Martin are African-American citizens of Arkansas and the United States. Osmose is an international employer of thousands of people throughout the world. Osmose is headquartered in New York state. Osmose treats and services utility poles throughout the state of Arkansas. Osmose hires local employees to work in crews servicing utility poles in a given local work site, including the southwest area of Arkansas. Servicing utility poles involves digging around each utility pole, treating the base with chemicals, and refilling the holes.

Plaintiffs worked in crews consisting of four men and a supervisor. Steve Fisher was Plaintiffs' supervisor. Fisher was responsible for hiring his own work crew. David Martin began

work on Fisher's crew on November 12, 2003. Orris Bowles began work on Fisher's crew on November 13, 2003. Richard Brandon began work on Fisher's crew on November 18, 2003. Darrien Williams began work on Fisher's crew on December 9, 2003. Of the four crew members, Bowles became the crew's defacto leader. Plaintiffs rode to a job site with either Fisher or Bowles. Bowles communicated most often with Fisher regarding the crew's working conditions.

Plaintiffs and Bowles all have difficulty reading and writing. Fisher completed Martin and Brandon's job applications. Williams completed his own job application. Plaintiffs and Bowles all earned $7.50 per hour. When hired, Plaintiffs and Bowles told Fisher they only wanted to work in south Arkansas. After Fisher conducted the interviews with Plaintiffs and Bowles, he put them to work without any information, written or verbal, about Osmose's anti-discrimination policy. Although Osmose has a written anti-discrimination policy, Fisher did not provide Bowles nor Plaintiffs a copy of the policy at their interviews. In any event, Osmose's anti-discrimination policy does not list a telephone number, address, or the name of a person to contact if an employee is discriminated against.

In late November 2003, Fisher began routinely cursing crew members and calling them by racially derogatory names, like "nigger," "black son-of-a-bitch," and "lazy black mother fuckers." Fisher routinely directed these racial epithets and racially abusive treatment at each plaintiff and Bowles on an almost daily basis. During an episode of hostility, Fisher threw a shovel in the direction of Bowles. On December 16, 2003, Fisher humiliated Martin by terminating him from his job in front of the other plaintiffs and using a racial slur when he fired Martin. After Williams began working on the crew, Fisher's language provoked Williams to

2

attempt to hit Fisher with a shovel, but Bowles physically stopped Williams without Fisher ever knowing of Williams' intentions. Williams quit the crew that day, December 17, 2003.

Plaintiffs and Bowles complained to Fisher about his use of racial slurs and epithets against them and about Fisher's abusive treatment of them. Fisher did not change his behavior after the crew confronted him. Thereafter, Bowles, Williams, and Martin all complained to Fisher's supervisor, Trevor Holmes, about Fisher's racial slurs and epithets. Bowles called Holmes three or four times and talked with him personally twice about Fisher's treatment of the crew. Holmes promised he would talk to Fisher about his conduct, but Fisher's treatment of the crew never changed. Bowles finally contacted an attorney about Fisher's treatment. The attorney contacted Osmose. Fisher found out he was under investigation for racial harassment on January 5, 2004. On the same day Fisher discovered he was under investigation regarding the treatment of his crew, Fisher pulled himself off the job and returned to his home. Since the crew was without a supervisor, its work ended on January 5, 2004. At that time, Osmose still had two to three weeks of work left in south Arkansas, which another crew finished. None of the plaintiffs worked for Osmose after January 5, 2004. Osmose never conducted an investigation of Fisher's treatment of the crew. Despite walking off the job, Fisher remained an Osmose employee until he quit in October 2004.

## II. Conclusions of Law

### A. Plaintiffs' hostile work environment claim under 42 U.S.C. § 1981

Plaintiffs have shown by a preponderance of the evidence that (1) they were members of a protected group, (2) they were subjected to unwelcome race-based harassment, (3) the harassment was because of their membership in the protected group, and (4) the harassment

3

affected a term condition, or privilege of their employment. *See Elmahdi v. Marriott Hotel Services, Inc.*, 339 F.3d 645 (8thCir. 2003)(setting forth the elements of a race-based hostile work environment claim under 42 U.S.C. § 1981). Plaintiffs endured race-based harassment that was severe and pervasive enough to affect a term, condition, or privilege of their employment, as is required to recover on a hostile-work environment claim under § 1981. *Id.* The harassment endured by Plaintiffs was severe as viewed by an objectively reasonably person, and Plaintiffs actually and subjectively viewed the harassment as severe. *Id.*

Several of the relevant factors in determining whether sufficient evidence of a hostile work environment, as set forth in *Elmahdi,* are present in Plaintiffs' case. For example, Fisher's conduct of berating Plaintiffs with racial slurs and epithets occurred on a daily basis and started about one week after Bowles began working on the crew. Fisher's conduct was severe. Fisher's conduct bordered on being physically threatening, once he threw a shovel in Bowles' area and another time his conduct almost resulted in Williams hitting him with a shovel. Fisher's conduct also humiliated Plaintiffs. He fired Martin, then made Martin ask for his job back. Fisher's conduct cannot be characterized as a mere offensive utterance. Fisher's conduct interfered with Plaintiffs' work performance. Plaintiffs' testified they would think about Fisher's conduct towards them instead of their work. The testimony of Plaintiffs' obviously showed that they thought more about Fisher's conduct than their work. The Court has little hesitancy in finding that Plaintiffs' have met the high threshold of actionable harm for a hostile work environment claim under § 1981; Plaintiffs have shown their workplace was permeated with discriminatory intimidation, ridicule, and insult as set forth above.

B.  **Osmose's affirmative defense under *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275 (1998)**

The *Ellerth/Faragher* affirmative defense is as follows:

> [a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate ... authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence ... . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270. Osmose cannot establish either element of this defense. Osmose did not exercise reasonable care to prevent and correct promptly Fisher's harassing behavior. The Court credits Plaintiffs and Bowles' testimonies that each of them informed Holmes of Fisher's uses of racial slurs and epithets throughout late November and December 2003. Holmes did nothing to rectify Fisher's treatment of his crew during that time. Holmes testified Osmose did not train him to deal with racial harassment complaints. Despite Osmose not telling Plaintiffs or Bowles how to report discrimination complaints, they told Holmes approximately seven times of Fisher's racial slurs and epithets by phone and Bowles told Holmes twice of the slurs in person. The Court does not credit Holmes' testimony that Plaintiffs and Bowles only complained about how hard Fisher worked the crew and about Fisher's race-neutral treatment of the crew in November and December 2003 and that the first time he received a racial discrimination complaint was from Bowles' attorney in January 2004. Osmose cannot take advantage of the *Ellerth/Faragher* affirmative defense.

C.  **Plaintiffs' argument for non-mutual offensive collateral estoppel**

During the trial of this matter, Plaintiffs urged the Court to apply the doctrine of non-mutual offensive collateral estoppel to foreclose Osmose from re-litigating the issue of liability in this case because Osmose unsuccessfully litigated that issue in *Bowles v. Osmose Utilities Services, Inc.*, Case No. 04-CV-4003 *affirmed by Bowles v. Osmose Utilities Services, Inc.*, 443 F.3d 671 (8thCir. 2006). The Court would then only decided what, if any, damages are appropriate. Plaintiffs have not briefed this issue, they only raised it at trial. Osmose has filed a post trial brief on the issue. The Court has found no federal case law applying the doctrine under Title VII, 42 U.S.C. § 1981, or any racial discrimination case. The Court sees no need to apply the doctrine here, when it has already found Osmose is liable to Plaintiffs based on the merits of their claims.

D.  **Plaintiffs' Damages**

1.  **Back pay**

Back pay awards in employment discrimination cases serve to make victimized employee whole for injuries suffered as a result of past discrimination and to deter future discrimination. *Gaworski v. ITT Commercial Finance Corp.*, 17 F.3d 1104 (8thCir. 1996). A district court has broad equitable discretion to fashion back pay awards in order to make discrimination victims whole. *E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664 (8thCir. 1992). As a general rule, employees who are discriminated against are entitled to awards such as back pay only if they were actually or constructively discharged from their employment. *Maney v. Brinkley Mun. Waterworks and Sewer Dept. (Arkansas)*, 802 F.2d 1073 (8thCir. 1986). A constructive discharge occurs when an employer deliberately renders an employee's working conditions

intolerable, thereby forcing him to quit. *Tatum v. Arkansas Dept. of Health*, 411 F.3d 955 (8thCir. 2005). To prove a case of "constructive discharge," an employee must show that (1) a reasonable person in his situation would find working conditions intolerable and (2) an employer intended to force an employee to quit. *Id.*, 411 F.3d at 960.

According to the testimony of Holmes, on January 5, 2004, when Fisher walked out on his crew, there was two to three weeks of work left on Osmose's contracts in south Arkansas. Richard Brandon was still working on the crew on January 5, 2004. Another crew already in south Arkansas performed the rest of the work in south Arkansas, so Brandon did not get paid for these three weeks of potential work even though he was still on an Osmose crew when Fisher walked off the job. It is clear to the Court that none of Plaintiffs wanted to leave south Arkansas to work. The Court finds Osmose discharged Brandon from its employment effective on January 5, 2004. The testimony indicated crew's basically worked at the behest of their supervisor. When Fisher, the crew's supervisor, quit, the crew was put out of work. Therefore, the Court finds Richard Brandon is entitled to an award of back pay representing three weeks worth of work, or 120 hours of work at the rate of $7.50 per hour. Brandon's total back pay award is $900.

Williams testified he quit the job because he became mad enough at Fisher to hit him with a shovel, but was prevented from doing so by Bowles. This incident, however, only occurred five days into Williams' employment. It is hard for a plaintiff to establish a constructive discharge claim when he has only worked for his employee for five days. The Court does not believe Williams has shown a constructive discharge, and therefore will not award Williams a back pay award.

Fisher fired Martin on December 16, 2003 using racial slurs in the process. The Court finds Fisher fired Martin because of his race. Therefore, Martin is entitled to a back pay award from December 17, 2003 through the additional three weeks that Osmose had work left in south Arkansas past January 5, 2004 when Fisher walked off the job. The Court finds Martin would have worked an additional 22 days during this period of time, had Fisher not fired him because of his race. Martin made $7.50 per hour. Therefore, the Court finds Martin is entitled to a back pay award of $1,320.

### 2. Front pay and/or reinstatement

When reinstatement is not possible, front pay is an appropriate alternative equitable remedy. *Campbell v. Arkansas Dept. of Correction*, 155 F.3d 950 (8thCir. 1998). The Court finds neither front pay nor reinstatement should be awarded in this case. Osmose ran out of work in south Arkansas two to three weeks after Fisher walked off the job. It is clear from the testimony none of the plaintiffs wanted to leave south Arkansas to work and that they have found work since their employment with Osmose.

### 3. Mental Anguish and Emotional Suffering

An employee's testimony about his mental anguish, along with the circumstances of the particular case, can provide a sufficient basis for awarding compensatory damages for mental anguish and emotional suffering under 42 U.S.C. § 1981. *See e.g. Kim v. Nash Finch Co.*, 123 F.3d 1046 (8thCir. 1997). Richard Brandon observed all of Fisher's conduct directed at the other members of the crew. Brandon testified Fisher's conduct "hurt him mentally" and "hurt him on the inside." Brandon also testified Fisher scared him when Fisher showed his .22 pistol and a rifle while on the job. However, Brandon also testified that Fisher did not direct racial slurs and

epithets at him, but did to Bowles, Martin and Williams. The Court finds Brandon did suffer mental anguish and emotional suffering and awards him $5,000 for his mental anguish and emotional suffering.

Williams testified Fisher's conduct has made him nervous when he is around white people now and that it is hard for him to work with white people. Williams never saw any of Fisher's guns, but Fisher talked about his guns in Williams' presence, which made Williams nervous. As mentioned above, Williams became so enraged, he picked up a shovel to hit Fisher, but Bowles kept Williams for hitting Fisher. Williams testified he has been angrier since the incidents with Fisher and that he stays to himself more. Williams testified that he did not want to come to court and participate in the trial. Williams only worked five days with Fisher, which the Court must take into account in determining an appropriate compensatory award. The Court finds Williams did suffer mental anguish and emotional suffering and awards him $5,000 for his mental anguish and emotional suffering.

Martin testified Fisher treated him cruelly. Martin thought about hitting Fisher with a bottle because of Fisher's conduct, but did not. One day the crew was working across from a funeral home and Martin's family was at the funeral home. He learned from a relative, while working by the funeral home, that his uncle had died. Fisher saw Martin not working and called to him and said, "Nigger, when I call you, you come nigger." Martin testified Fisher's conduct made him feel low, hurt him emotionally, and has made him more sensitive. Martin testified he pulls away from white people now; before experiencing Fisher's conduct he did not do this. Martin also was humiliated when Fisher used racial slurs and epithets when firing him. Martin worked nearly as many days as Bowles did and endured Fisher's conduct on an almost daily

9

basis. The Court believes Fisher's conduct caused Martin substantial mental anguish and emotional suffering. The Court finds awards Martin $20,000 for his mental anguish and emotional suffering.

### 4. Punitive Damages

The Eighth Circuit Court of Appeals has already affirmed Bowles' punitive damage award in his lawsuit against Osmose. *See Bowles v. Osmose Utilities Services, Inc.*, 443 F.3d 671 (8thCir. 2006). The Court has no doubt that punitive damages are appropriate in this case. The evidence presented shows and the Court finds that, at a minimum, Osmose was recklessly indifferent to Plaintiffs' federally protected right to be free from racial harassment. *See Williams v. ConAgra Poultry Co.*, 378 F.3d 790 (8thCir. 2004). Plaintiffs and Bowles contacted Holmes a number of times in November and December 2004 about Fisher's racially charged conduct and the Holmes failed to investigate their claims. Osmose never trained Holmes to handle race-based complaints. Osmose never informed its laborers how to make discrimination complaints. Furthermore, Fisher's free use of racial slurs and epithets was reprehensible conduct. An award of punitive damages will, hopefully, deter Osmose and other companies from similar conduct.

Osmose has argued that it cannot be held responsible for multiple awards of punitive damages based on the same set of occurrences. It has cited no case law to support this contention, and the Court does not agree. Bowles' award of punitive damages only takes into account Fisher's conduct regarding one plaintiff, not the three plaintiffs in this suit. In analyzing this issue, it is helpful to think of how the Court would have submitted a punitive damages issue to the jury. If this had been a jury trial, the Court would have used separate verdict forms[1] for

---

[1] 8TH CIR. CIVIL JURY INSTR. 5.03 (2005).

each plaintiff. Each would have allowed for an award of punitive damages specific to each plaintiff.

In the *Bowles* case, the Eighth Circuit Court of Appeals affirmed an award of punitive damages that was four times the amount of compensatory damages awarded. Here, the Court finds an appropriate ratio on compensatory damages to punitive damages is two to one. Therefore, the Court awards punitive damages in favor of Richard Brandon in the amount of $11,800. The Court awards punitive damages in favor of Darrien Williams in the amount of $10,000. The Court awards punitive damages in favor of David Martin in the amount of $42,640.

### 5. Attorneys Fees

Attorneys fees and costs are recoverable by prevailing parties in an action under 42 U.S.C. § 1981. *See* 42 U.S.C. § 1988(b). Since Plaintiffs' prevailed on their claims, they are entitled to an award of attorneys fees and costs. Plaintiffs' are instructed to submit affidavits in support of attorneys fees and costs within 14 days of the entry of this Memorandum Opinion. Osmose may file a response within 14 days of the filing of Plaintiffs' affidavits. The Court will enter a judgment after determining the appropriate amount of attorneys fees.

## III. Conclusion

For reasons discussed herein and above, the Court finds in favor of Plaintiffs Richard Brandon, Darrien Williams, and David Martin on their racial discrimination claims under 42 U.S.C. § 1981. The Court awards damages in favor of Richard Brandon as follows: $900 for back pay; $5,000 for mental anguish and emotional suffering; and $11,800 in punitive damages. The Court awards damages in favor of Darrien Williams as follows: $5,000 for mental anguish

and $10,000 in punitive damages.  The Court awards damages in favor of David Martin as follows:  $1,320 in back pay; $20,000 for mental anguish and emotional suffering; and $42,640 in punitive damages.

      IT IS SO ORDERED, this 12th day of June, 2006.

                                                /s/ Harry F. Barnes
                                            Hon. Harry F. Barnes
                                            U.S. District Court